**Kenneth E. JAMES, Plaintiff,**

v.

**NATIONAL BUSINESS SYSTEMS and Timothy Casgrain, Defendants.**

**Civ. No. F 88–116.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Sept. 25, 1989.

Alan VerPlanck, J. Michael O'Hara, Barrett & McNagny, Fort Wayne, Ind., for plaintiff.

William T. Hopkins, Jr., Gallucci, Hopkins & Theisen, Fort Wayne, Ind., for defendants.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. At the conclusion of that trial, this court ordered the parties to submit post-trial briefs. Final arguments were heard on June 26, 1989, and the parties submitted marked findings of fact on August 7, 1989. The following Findings of Fact and Conclusions of Law are entered pursuant to Federal Rule of Civil Procedure 52(a), after having examined the entire record and after having determined the credibility of witnesses.

## FINDINGS OF FACT

The defendant, National Business Systems, Inc. (NBS), is a Canadian corporation. In March, 1985, NBS bought the MDS DEK Division of Mohawk Data Services, including its manufacturing facility in Fort Wayne, Indiana. Clive Raymond, Chief Executive Officer of NBS, hired Vincent Tofany, who had been president of MDS DEK Division of Mohawk, to be President of NBS Imaging Systems, Inc. (NBSI), the newly acquired manufacturing facility in Fort Wayne. During negotiations of Tofany's employment agreement, he and Raymond discussed an executive compensation plan because the sale of MDS DEK Division to NBS did not include assumption of Mohawk's pension plan for key executives. Tofany explained to Raymond that such a plan was necessary in the United States in order to hire or retain personnel because the United States did not have the social

programs relied upon by retirees in Canada.

Tofany moved to Fort Wayne, Indiana in May 1985, to take over operation of NBSI. During the summer of 1986, Tofany hired the plaintiff, Kenneth E. James, as a consultant over personnel and human resources functions due to expanding operations at NBSI. James entered into a consulting agreement which covered the period from August 15, 1986 through July 31, 1987. Tofany hired James on a consultant basis because he was unsure whether NBSI needed a full time personnel officer. James' duties as a consultant included working with Donald Morrison, an independent insurance agent, in setting up employee benefits programs, including a retirement benefits plan for key executives of NBS and NBSI. James' work in formulating the plans was based in part on his prior experience in setting up similar plans at Mohawk Data Sciences where he had been vice-president of human resources.

Between July 1986 and November 1986, James, Morrison and Raymond had several meetings to discuss the creation of an executive compensation plan. The plan was developed as an enticement for new personnel and a benefit to retain present executives. Morrison and Raymond developed the specifics of the plan: the benefits to be provided, a vesting schedule, a change of control provision, the final list of initial executives who would participate, and a method for funding the plan. In November 1986, Raymond had chosen six key executives of NBSI in Fort Wayne, Indiana, as well as several NBS key executives in Canada to participate in the plan.[1] Raymond authorized Morrison to make an oral presentation of the plan to each of the chosen executives. Morrison accompanied his oral presentation with a written letter to each executive which indicated that the plan was "to come into effect January 1st 1987 or as soon thereafter as life insurance comes into effect."[2]

Although there were a few details of the plan which were not finalized at the time Morrison met with the chosen executives, the plan which went into effect on January 1, 1987 was definitely to provide the following:

> At normal retirement, age 65, 100% of base earnings in effect on January 1, 1987 would be paid to the executive for each of the subsequent ten (10) years, or continued to his named beneficiary should he not live to age 75.

> In the event of death, prior to retirement, the executive's beneficiary would receive 100% of base earnings in effect on January 1, 1987, for each ten subsequent years.

> Upon change of control of the plan sponsor (NBS) a participant would immediately vest for those years or portions thereof following his designation as a paratici-pant [sic][3]

1. The chosen executives from Fort Wayne, Indiana were Vincent Tofany, Carlos Urrutia, Nick Denice, John Tornblom, Jack Craven and E. Milano.

2. Morrison and James had several meetings with Raymond to discuss the plan details and implementation. Although Raymond was not available to testify, both Morrison and James testified that Raymond intended to put the plan, as discussed, into effect on January 1, 1987 and fund it by purchasing life insurance for the participating executives. Tofany also testified that the plan was implemented on January 1, 1987.

3. Defendants contend that the change of control provision did not exist as part of the plan because it was never put in writing, never communicated to any of the proposed participants and was not referred to as a provision in the proposed plan. However, the uncontradicted testimony of Tofany, Morrison and James clearly establishes that one of the provisions Raymond wanted in the plan was for an interest in the plan to immediately vest in the executives should Raymond no longer be with NBS. James and Tofany also testified that they were verbally assured that the change of control provision was part of the plan and would be included in the written plan document when it was prepared. James and Morrison explained that no formal written plan document was ever prepared because Raymond wanted the executive benefits to be the same for the employees in the United States and the employees in Canada. Legislation was pending in the Canadian Parliament which would change the retirement benefits laws and Raymond did not want the written plan to become ineffective for the Canadian executives due to the final acts of Parliament. Since no written plan document exists, this court must rely on the believable testi-

Mr. Raymond's departure from the company would constitute a change of control.

Executives age 55 and under at implementation would not acquire an interest in the full benefit until having been employed with NBS for 10 years.

Executives over the age of 55 at implementation would enjoy accelerated vesting, being entitled to the full benefit at age 65 regardless of the number of interim years.

Morrison, who had been a business associate of Raymond for more than 25 years, recommended the purchase of whole life insurance for each participating executive as a method for funding the plan. Raymond agreed to this method, and by January 1, 1987, insurance physicals had been scheduled for all of the participating executives. Raymond subsequently approved the payment, by NBS, of thousands of dollars in insurance premiums.[4] As of January 1, 1987, the chosen six executives from NBSI were participants in the executive retirement plan as designed by Raymond and Morrison. Sometime after that date, but prior to January 26, 1988,[5] whole life insurance was taken out on each executive to fund the plan.

After January 1, 1987, Tofany used the retirement plan as a benefit to entice new senior management personnal. In an employment offer letter dated July 1, 1987, Tofany informed R. M. McMahon that he would be "eligible for membership in the NBS Executive Insurance Plan" on the first anniversary date of his employment. In the letter, Tofany stated that "[t]he primary purpose of this plan is to provide Senior Executives with a combination of a significant pension benefit, substantial LTD coverage, and additional Life Insurance Protection."[6] The same language

mony of Morrison, James and Tofany to the extent that they actually participated in the plan's preparation.

4. In September 1987, a letter was drafted by Joseph Dickstein, a close business associate of Morrison, who was hired to handle the technical details of the retirement plan and whole life insurance. Dickstein sent the letter to the Chief Financial Officer of NBS stating in part:

You have asked for our suggestions regarding financial statement and 10K disclosure for the September 30th, 1987 year end relating to the discussions Don Morrison and I have had with your Company in the last twelve months. There are three areas involved.

&ast; &ast; &ast; &ast; &ast; &ast;

The second relates to the key man insurance put in force during this period. While we understand that it is not an absolute requirement that you do so. If you feel you want to make any disclosure our suggested wording would be;

Key man life insurance totalling $5,706,000 in Canadian funds on eleven key executives and $4,271,000 in $U.S. funds on six key executives was put into force. Ownership of the insurance policies as well as all rights to the receipt of the proceeds rests with NBS and subsidiary Companies.

The third relates to our discussions covering some form of executive benefit plan to cover death, disability or retirement. As this program is still at an early discussion stage and nothing has been finalized or approved either by management or by the directors, we are assuming that there is not any legal agreement between the company and its executives, (other than the two referred to above), therefore it is my feeling that there is nothing to report at this time. If as and when the program is finalized, it can be disclosed. If this takes place prior to the finalizing of these reports we will notify you so that it can be included in the 1987 reporting. Otherwise, if it is implemented in 1987–1988 we will notify you at the appropriate time.

Contrary to the specific statements made in Dickstein's letter, both James and Morrison testified that the insurance policies were taken out for the sole purpose of funding the pension plan and not as "key man" insurance. Furthermore, Morrison testified that Dickstein's conclusions were based on technicalities and the fact that there was no plan *on paper.* Because no written plan existed, proceeds of the insurance policies would have gone to NBS, and thus, technically the policies qualified for "key man" insurance treatment on the 10–K form. Morrison also testified that he believed there was a plan in effect from the moment he conveyed Raymond's promises to the executives since he had put executive compensation plans in at other companies without explicit board approval. Also, Morrison stated that he would have known if the Board of Directors of NBS had *not* approved the plan. There was no evidence presented which contradicted Morrison's explanation of Dickstein's letter.

5. This is the date on which Raymond resigned as Chief Executive Officer of NBS.

6. This explanation of the "Executive Insurance Plan" was not included in the terms of the

was used in an employment offer Tofany made to Harry Hoberman dated December 21, 1987.[7]

On August 1, 1987, James' consulting agreement was converted to an employment agreement[8] under the following terms:

1. Your title will be Vice President of Administration reporting directly to me with current responsibility for the Human Resources, EDP, Facilities, Purchasing, and Customer Service functions and other Administrative duties as assigned.

2. You will participate in the normal company salary plans regarding performance and salary reviews. Initially your monthly salary will continue at the same consulting rate of $7,580 per month.

3. Effective October 1, 1987 you will participate in a bonus program designed for Senior Staff personnel to earn 20% of annual base salary at 100% performance against selected criteria. For the remainder of FY87, you will earn $1,420 bonus per month (same as in Consulting Agreement) subject to the completion of FY87 bonus objectives assigned to other members of the Senior Staff.

4. You will be immediately eligible for all benefits in effect for U.S. employees including the participation of Maryalice James under the Group Medical and Dental Insurance Programs.

5. You will continue to be provided the use of an automobile under the terms of the Executive Automobile Policy and will participate in the Executive Benefit Plan.

6. You will be recommended to the Corporate Compensation Committee for a stock option award in October 1987 in a number of shares commensurate with your Senior Staff position.

7. You shall be enrolled in the Executive Insurance Plan at a time selected by Mr. Raymond and you shall participate in all future compensation programs designed for Senior Management personnel.

Tofany conveyed the above terms along with the employment offer to James in a letter dated July 27, 1987. Upon acceptance of the offer, James moved his residence from New Jersey to Fort Wayne, Indiana. James began receiving a salary of $90,800 per year. An inducement to James' acceptance of the employment offer was participation in the retirement plan. Since one of the benefits in effect for selected United States employees at the time of the offer was the retirement plan designed by Raymond and Morrison, James became a participant in that plan as of August 1, 1987, pursuant to paragraph 4 of the terms and verbal assurances from Tofany.

employment offer Tofany made to James. It is clear that such an explanation to James was unnecessary since James helped design the plan and knew how it worked.

7. The letter Tofany drafted was actually dated December 21, 1988, but the testimony at trial clearly established that was a typographical error and the actual date was December 21, 1987.

8. Defendants contend that an April 22, 1987 directive from Raymond to all senior management personnel expressly limited Tofany's authority to hire James and offer him the terms and conditions set forth. Raymond's directive specifically stated:

The appointment of any senior management personnel for subsidiaries or divisions, must receive the approval of Corporate including terms and conditions of employment.

Defendants argue that since there was no express approval by Corporate, the offer Tofany made was not binding on NBS. However, Tofa-

ny testified that Raymond personally excepted him from the directive and explained that it was written for the purpose of stopping reckless hiring at a different subsidiary. Furthermore, the actions of Tofany and Raymond were consistent with Tofany's retention of hiring authority. There was no negative response from Raymond when Tofany notified him by letter dated July 22, 1987 that James would be a member of senior management on August 1, 1987. James and Raymond worked together occasionally after August 1, 1987. James received a monthly salary after July 1987. Tofany hired R. M. McMahon as General Manager of the South Plainfield operation on July 1, 1987, and made job offers to several other prospective members of senior management after the April 22 directive was sent. This court finds as a matter of fact that Tofany retained hiring authority after April 22, 1987.

Based on James' salary, he would have received a retirement benefit of $908,000 if he remained employed by NBS until he became age 65 on August 31, 1995. Francis C. Thissen, a consulting actuary, testified that, based on accepted accounting and actuarial principles, the present fair market value of James' full retirement benefit is $415,157.

It is clear that the "Executive Insurance Plan" referred to in paragraph 7 of the terms is not the retirement plan which went into effect on January 1, 1987. The "Executive Insurance Plan" can refer to nothing other than the whole life insurance which funded the retirement plan. Enrollment in the "Executive Insurance Plan" required Raymond's initiation because payment of the insurance premiums by NBS required Raymond's approval. James never received approval from Raymond to be enrolled in the "Executive Insurance Plan" nor was an insurance application or physical ever scheduled for James. The reason that James did not participate in the "Executive Insurance Plan" had nothing to do with his participation in the retirement plan. As James, Morrison and Tofany all testified, the timing was bad for James' enrollment for whole life insurance. James was busy traveling to all of the corporate divisions in the United States to communicate a flexible benefits plan to NBS employees and did not have time for a physical. Raymond had retreated into semi-seclusion over the developing financial problems of NBS and was unapproachable. Morrison had a difficult time getting to Raymond to apprise him of the flexible benefits plan developments and was unable to discuss insuring James. Clearly, all of those involved anticipated that James would eventually be enrolled in the "Executive Insurance Plan" because that was the funding mechanism for the retirement benefit that he became entitled to on August 1, 1987. The fact that James never was enrolled in whole life insurance does not affect the fact that he was "immediately eligible" for the retirement plan upon acceptance of full time employment.

On January 26, 1988, Raymond resigned as Chief Executive Officer of NBS. On February 25, 1988, James was terminated from his employment with NBSI. The next day, James had a conversation with Murry Small, an agent of NBS, regarding the "Executive Insurance Plan" and benefits for Tofany and Urrutia. James did not mention his own entitlement to a retirement benefit at that time.

## CONCLUSIONS OF LAW

This court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1101, *et seq.*, ERISA. Jurisdiction over the parties is conceded by counsel.

This is a claim for benefits under the NBS retirement plan which went into effect on January 1, 1987. James also claims that as a participant in that plan, he is entitled to recover the vested portion of his promised benefit pursuant to 29 U.S.C. § 1132. In order to recover, James must show the existence of an ERISA-covered plan, his participation in the plan and denial of benefits due him under the plan.

### I. Existence of an ERISA Plan

By its terms, ERISA applies only to employee benefit plans. An employee benefit plan is, by definition, "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both ..." 29 U.S.C. § 1002(3). A welfare benefit plan is defined in pertinent part as:

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1). A pension benefit plan, however, is:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>
>> (i) provides retirement income to employees, or
>>
>> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A).

The NBS plan under which James claims entitlement provides for a pension on retirement or death, and therefore, is covered by ERISA as an employee benefit plan.

▆▆▆ A plan is established under ERISA if "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982). A plan may exist even when it is not in a formal written document. *Id.* Furthermore, failure to adhere to the requirements set forth in ERISA does not exempt an employer from coverage of the Act. *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503 (9th Cir.1985). Finally, in *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732 (7th Cir.1986), the Seventh Circuit suggested that establishment of a plan required a showing that "the decision to extend benefits has become a reality", and the sequence of events may be determinative of that issue. *Id.* at 739.

▆▆▆ The findings of fact in this case clearly show that, despite lack of a formal written document, a reasonable person could ascertain that the intended benefits under the plan were 10 years of payments of 100% of the employee's base year salary. The class of beneficiaries of the plan were chosen senior management personnel and their stated beneficiaries. The source of financing was whole life insurance policies taken out on each covered employee. The procedures for receiving benefits consisted of a maximum of ten years to fully vest, one full year of employment before acquiring a vested interest (unless Raymond should leave the company at which time all covered employees immediately acquired an interest in their vested amount) and payments to begin upon retirement and attainment of age sixty-five or at death, whichever occurred first. The decision to extend these benefits became a reality when Morrison notified the chosen senior management personnel of the plan. At that time the insurance physicals were scheduled to also place the funding mechanism in motion. Subsequent to January 1, 1987, the company held out the retirement plan as a benefit to entice new employees. There is no doubt that an ERISA-covered pension benefit plan was established by NBS as of January 1, 1987.

## II. *James' Participation in the Plan*

▆▆▆ James seeks recovery of his pension benefits under 29 U.S.C. § 1132, which provides in pertinent part:

> A civil action may be brought—
>
>> (1) by a participant or beneficiary—
>>
>> \* \* \* \* \* \*
>>
>> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>>
>> \* \* \* \* \* \*
>>
>> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provisions of this subchapter or the terms of the plan;

A participant includes "any employee or former employee of an employer, ... who

is or may become eligible to receive a benefit of any type from an employee benefit plan ..." 29 U.S.C. § 1002(7).

James is clearly a participant within the statutory definition. He is a former employee, having been hired on August 1, 1987 and terminated on February 25, 1988. He also became "immediately eligible for all benefits in effect for U.S. employees" and was assured that he would "participate in all future compensation programs designed for Senior Management personnel" at the time he became employed by NBS. The fact that James never actually obtained whole life insurance to fund the pension benefit is inconsequential to a determination that he was a participant in the retirement plan.

### III. Benefits Due James

■ The facts established that James acquired an interest in his retirement plan upon Raymond's resignation as Chief Executive Officer of NBS on January 26, 1988. Although James' employment was not terminated until one month later, each party calculated James' benefit based on six months of entitlement, and therefore, this court will accept that figure as appropriate. In order to be entitled to 100% of his retirement benefit, James would have had to work for NBS for eight years and one month.[9] A simple mathematical calculation reveals that upon Raymond's resignation James was entitled to 6.185%[10] of his full benefit. Since the present value of James' full benefit is $415,157, he is entitled to recover $25,677.46.

James may also be entitled to reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g), which states in part:

In any action under this subchapter ... by a participant ..., the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

James has requested that this court schedule a hearing on the matter of attorney's fees should he prevail on this ERISA claim; however, he has not submitted a request for fees detailing the amount his attorney seeks under § 1132(g) and a hearing without a motion would be fruitless. Therefore, James will be ordered to submit a motion to the court within 20 days from the date of this order setting forth detailed information justifying his request for fees.

### CONCLUSION

James has shown by a preponderance of the evidence that an ERISA-covered employee benefit plan was established by NBS, that he was a participant in the plan, and that he is entitled to a benefit in the amount of $25,677.46 under the plan. Defendant NBS is hereby ORDERED to pay to plaintiff, Kenneth E. James, the sum of $25,677.46. Plaintiff is ORDERED to file a motion for fees and costs within 20 days from the date of this order, detailing his request for fees and costs.

---

**9.** James' employment with NBS began on August 1, 1987. His birthdate is August 31, 1930. James, therefore, would have attained age sixty-five in eight years and one month after beginning his employment with NBS.

**10.** James would have received a full benefit in ninety-seven months, but was only entitled to six months' worth of benefit. Therefore, James' benefit due upon Raymond's resignation was 6/97 or 6.185% of the full amount.