William McVEIGH

v.

**PHILADELPHIA NATIONAL
BANK, et al.**

Civ. A. No. 90–7943.

United States District Court,
E.D. Pennsylvania.

May 19, 1992.

Joseph V. Furlong, Jr. and James J. Martin, Philadelphia, Pa., for plaintiff.

Richard G. Rosenblatt, Michael L. Banks and Cortez Smith, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendants.

## OPINION

CAHN, District Judge.

Plaintiff William McVeigh ("McVeigh"), who was employed as the co-pilot of John T. Dorrance's ("Dorrance") personal aircraft from 1979 until Dorrance's death in 1989, is suing Dorrance's executors ("Executors") under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), for pension benefits that he alleges vested in him during his employment. McVeigh alleges that, despite the absence of a written pension plan or any sign that Dorrance had performed any step to comply with the reporting requirements of ERISA, Dorrance had established a pension plan for his personal staff and that McVeigh was a participant in this plan. McVeigh's claim was tried before me without a jury on April 1-2, 1992. I find that even if had Dorrance established a pension plan under ERISA, (a question upon which this court has no opinion), there is no proof upon which I can conclude that McVeigh was either eligible to, or did in fact, participate in the alleged plan.

### I. *Background*

Dorrance, a member of the family that controlled the Campbell Soup Company, was a man of great wealth. He had a personal staff that performed a variety of tasks for him, ranging from gardening at his estate to flying his private airplane. He clearly was on very familiar terms with this staff (which numbered about 25 at his death) and seemed to take a personal interest in their well-being. On the other hand, he also seemed to be a very intimidating man: He did not rely very much on outside experts to advise him on the management of his personal estate and staff, and he did not disclose very much of his intentions with regard to the management of his estate and staff to others. Very little, it seems, was written down in any organized fashion.

Dorrance had a practice of retaining many of his employees on his payroll after he decided that they would be "permitted" to retire. He instructed his bookkeeper, Elizabeth Brown, to send paychecks to these employees and these payments were recorded in Ms. Brown's books as stipends sent to "pensioners." At the time of his death, eleven "pensioners" were receiving stipends. On the instruction of Alfred Novello, Dorrance's accountant, Ms. Brown recorded the "pensioners'" stipends on a W-4P form, rather than a W-2 form.

There is no evidence that Dorrance ever took a deduction under 26 U.S.C. § 401(a) for any contribution made by him on behalf of a participant in the alleged pension plan. It appears that Dorrance never placed in writing any description of the alleged plan or the criteria for eligibility under the alleged plan; nor did he establish a clearly demarcated source of funding for the alleged plan; nor did he submit the plan to the Internal Revenue Service to "qualify" it so that he could enjoy the tax benefits associated with 26 U.S.C. § 401(a).

It seems that every one of Dorrance's employees who were "retired" by Dorrance (always after reaching age 65 or older) began to receive checks in their capacity as "pensioners." At least two individuals who left Dorrance's employ to take other jobs apparently possessed no vested pension rights. Dorrance told at least one employee who asked—in order to determine whether to set up an Individual Retirement Account—that *that* employee had no pension through his employment with Dorrance.

After Dorrance's death, the Executors met and decided to terminate Dorrance's personal staff. They decided to offer severance packages to each employee consisting of a month of current salary for each year of service. They considered and rejected the claim made by McVeigh, Mr. Raef, Mr. Novello, and William Unhoch (Dorrance's Boat Captain), that there was a pension plan and that they qualified for vested benefits under ERISA. These employees as well as some or all of the others were asked to waive all claims to this al-

leged pension in exchange for their severance pay. The Executors considered the Dorrance estate's obligation to the "approximately ten former employees who were receiving continuing payments" during Dorrance's lifetime, and concluded that "the estate would continue to make these payments for the time being...." *See* Minutes of Executors' Committee Meeting, August 22, 1988 ¶ 6. McVeigh was offered a severance payment of $51,000, which he refused because he would not sign a release with regard to his rights to sue for vested benefits under ERISA.

## II. *This Court Does Not Need To Decide If There Was A Pension*

As noted in this court's Order of February 28, 1992, McVeigh does not have to prove the existence of a written pension plan in order to prove the existence of a plan: Plaintiff may argue that "a pension plan came into existence through the statements and actions of Mr. Dorrance and his agents." *McVeigh v. Philadelphia National Bank,* No. 90–7943, slip. op. at 1 n. 1 (E.D.Pa. Feb. 28, 1992). *See also Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) (*en banc*) (stating four part test to determine whether employer established an unwritten pension plan); *Frank v. Colt Indus., Inc.,* 910 F.2d 90, 97–98 (3d Cir. 1990) (adopting *Donovan* test for establishment of pension plan).

■ The question of whether a employer can be found to have established a plan where there is no written record of the employer's intent requires careful evaluation of the particular facts of each case. *See, e.g., Harris v. Arkansas Book Co.,* 794 F.2d 358 (8th Cir.1986) (unwritten pension plan not found to exist despite plaintiff's claim that he was promised pension); *James v. National Business Systems,* 721 F.Supp. 169 (N.D.Ind.1989) (unwritten pension plan found to exist), *vacated and remanded on other grounds,* 924 F.2d 718 (7th Cir.1991).

In this case, the court declines the invitation of both parties to determine the difficult question of whether Dorrance had established a pension plan. This question is moot, since it is clear from the evidence that *even if* the pension plan McVeigh alleges existed, McVeigh has adduced insufficient evidence to prove by a preponderance of the evidence that he was either eligible for, or participated in, the alleged plan. Given that McVeigh cannot pass this first threshold, I need not reach the second—whether a plan existed at all. *See James,* 924 F.2d at 720 (district court must determine plaintiff's eligibility for unwritten plan before awarding pension).

## III. *McVeigh Has Not Proven His Eligibility*

■ While ERISA is very strict with regard to the rights of workers who participate in a pension plan, ERISA is very permissive about whether an employer sets up a plan at all, and if it does, who may participate in that plan. No employer is required to establish a pension plan. If an employer establishes a plan, the criteria for eligibility may reflect a wide range of the employer's management goals, provided that the employer does not violate a limited group of prohibitions. The prohibited criteria for eligibility that may not be adopted by an employer pertain to "tax qualified" pensions plans in which the employer is allowed a deduction under 26 U.S.C. § 401(a) for contributions it makes on behalf of plan participants to fund the plan.[1] In order to qualify, a plan must meet two tests. Under the first test, a plan must conform to certain minimum and maximum participation standards concerning the age of the participants and their length of service. *See* 29 U.S.C. § 1052(a) and (b); 1 J.D. Mamorsky, *Employee Benefits Law: ERISA and Beyond* (1991) § 4.01 (hereinafter "Mamorsky"). The second test "is aimed at assuring that coverage is sufficiently broad or representative. This test can be satisfied by showing that a requisite percentage of employees is covered or that

---

**1.** It is simply impossible to determine from the evidence presented whether the alleged plan was tax qualified or not. *See* N.T. April 13 at 27

(citations to the record are in the form N.T. (date) at (page).

the covered group represents a nondiscriminatory cross section of employees." Mamorsky at § 4.01; *see also* 26 U.S.C. § 410(b). The general purpose of the "classification test" is to insure that a plan's criteria for eligibility do not discriminate in favor of officers, stockholders, or highly paid employees. *See* 26 U.S.C. § 410(b)(1)(B); IRS Reg. § 1.410(b)–1(d)(2), 26 C.F.R. § 1.410(b)–1(d)(2). The Internal Revenue Service ("IRS") has ruled that ERISA allows eligibility criteria that limit plan participation to only salaried workers, or clerical workers, or nonunionized workers, or hourly wage-earning workers, or workers in a particular plant or department, as long as there is no discrimination in favor of officers, shareholders or highly paid employees. *See* Mamorsky at § 3.02[1].

It is clear that Dorrance may have set up the eligibility criteria of his alleged plan to include or exclude a wide range of his employees and may have based those criteria on reasons that, to an outsider, might have appeared *ad hoc* or irrational. Notwithstanding the wide range of options available to Dorrance, Plaintiff argues that Dorrance based the alleged plan on the broadest possible eligibility criteria—that *every* personal employee was to be eligible to participate in the alleged pension plan (assuming that each met ERISA's age and service requirements). *See* Plaintiff's Memorandum of Law at 8.

▪ Having reviewed Dorrance's actions from which Plaintiff asks this court, as factfinder, to find that a pension plan had been established pursuant to the *Donovan* test, I find that the plan Plaintiff alleges could not have been based upon the eligibility criteria urged in his Memorandum of Law. I find this for two reasons. First, it is clear that not all of Dorrance's employees received pensions. Louis Mazzio, Dor-

rance's caretaker of twenty years, testified that he asked Dorrance in 1982 whether he could start an IRA and also participate in a pension plan, and Dorrance told him, "No pension, go ahead and get your IRA." N.T. April 1 at 180. The record shows that Lew Stiles, McVeigh's predecessor, met ERISA's age and service requirements and yet apparently left his employment with Dorrance with no vested pension benefits. *See* N.T. April 2 at 29. Similarly, Stephen Sonnenfeld, a gardener, left after twelve years of service with no vested benefits. *See* N.T. April 1 at 137.[2]

Absent any evidence to the contrary, I must conclude that Messrs. Mazzio, Stiles and Sonnenfeld were never eligible for pensions under Dorrance's alleged plan, and not that they were eligible but that Dorrance excluded them from the plan in error. If this is the case, then it becomes an open question as to who else would also fall outside the eligibility criteria of Dorrance's alleged plan. To determine which employees may have been eligible for the plan, one must discover what the alleged plan's eligibility criteria were (given that the criteria clearly did not establish a simple rule of universal eligibility), and whether they violated ERISA's non-discrimination rule outlined above.

Unfortunately, there is very little evidence on this last question. If the court had to choose among "reasonable meanings" of an ambiguous criterion for participation in the plan, then I would be obliged to interpret the criterion against the draftsman of the plan, namely Dorrance. *See* Restatement of Contracts 2d § 206 ("in choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words...."). But there simply is

---

**2.** In oral argument, Plaintiff noted that the fact that other workers left Dorrance's employ without vested benefits does not prove that there was no plan, since one explanation for their lack of benefits may be the violation of ERISA by Dorrance. *See* N.T. April 13 at 8. This may be true but it is irrelevant. It is true that, according to *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503 (9th Cir.1985), failure to comply with

ERISA's requirements cannot be used as conclusive proof that no plan subject to ERISA ever existed. But I am not now reviewing Dorrance's treatment of Messrs. Stiles or Sonnenfeld to determine if a plan existed. I am assuming, *arguendo*, that a plan existed, and am reviewing Dorrance's treatment of Stiles and Sonnenfeld to determine the *criteria* of eligibility adopted by the alleged plan.

nothing to interpret here: Plaintiff has not produced a single criterion for participation for the court to interpret in its favor. I cannot interpret the only criterion Plaintiff has offered during trial, that all employees were eligible, since that criterion was clearly not intended by Dorrance. In the absence of an ambiguous contract term to interpret, this court cannot supply meaning.

McVeigh may argue that although he may not be able to supply the criteria for participation Dorrance intended for the pension plan, he has proven that whatever that criteria were, he qualified under them, since he was told by Mr. Raef that he would receive a pension if he accepted employment with Dorrance. *See* N.T. April 1 at 46. This testimony is not credible. Mr. Raef testified that he did not make such a statement. N.T. April 2 at 12. Sharon McVeigh, McVeigh's ex-wife and who attended the meeting where the alleged statement was made, testified that she could not recall such a statement having been made. N.T. April 1 at 168. In fact, Mr. Raef testified that he recalled Dorrance specifically telling McVeigh when he was hired that "I [Dorrance] have no pension plan." N.T. April 2 at 15.

Plaintiff has not proved, by a preponderance of the evidence, that he would have qualified to participate in the pension plan that he alleges had been established by Dorrance's actions. There is no need, therefore, for this court to pursue the question of the existence of the alleged pension plan.[3]

## IV. *McVeigh's Severance Pay*

■ Defendants withdrew their offer to McVeigh of severance pay after he refused to sign a waiver promising not to pursue the alleged vested pension benefits under ERISA. *See* N.T. April 1 at 78 (McVeigh had to sign an "agreement" in order to receive severance pay); N.T. April 2 at 84

(Mr. Pindle testifying that the "agreement" McVeigh was asked to sign was a release of claims against the estate). The Defendants had no right to offer McVeigh severance pay with such an onerous condition attached; the choice offered McVeigh was a violation of ERISA. The court's reasons for finding this are twofold. First, it is clear that the Executors chose to offer severance pay on behalf of Dorrance. Their actions could be understood as their best attempt to enforce Dorrance's wishes, in which case it would not be difficult for this court to find that the Executors believed that Dorrance had a severance pay plan, and they were administering it. *But see* N.T. April 2 at 114 (Mr. Pindle testifying that he believed that the Executors did not believe that they had a legal obligation to offer severance pay). If in fact Dorrance had a severance pay plan, it would be an "employee benefit plan" and would be governed by ERISA in much the same way that a pension plan would have been. *See Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1502 (9th Cir.1985) (severance pay may be an employee welfare benefit under 29 U.S.C. § 1002(3)). If this is the case, then Defendants are prohibited from discriminating against McVeigh—as a participant in an employee welfare benefit plan—because of his decision to exercise his rights under ERISA. *See* 29 U.S.C. § 1140; *see also Panter v. American Synthetic Rubber Corp.*, 686 F.Supp. 1210 (W.D.Ky.1984) (applying § 1140 to severance pay plan).

■ Second, even if the offer to McVeigh was not part of a severance pay plan established by Dorrance, it seems to this court that it is still a violation of § 1140 to coerce an employee to waive his claims under ERISA through the threat of denying him some employment benefit that he would have normally received, even if that employment benefit is not itself protected under ERISA and even if the ERISA claim urged by the employee is ultimately

---

**3.** It is clear, however, that according to the foregoing analysis, the individuals who were described by Dorrance as "pensioners," and received checks after their retirement from Dorrance's employ, may argue that the best evidence that they satisfied the criteria to partic-

ipate in Dorrance's alleged pension plan is that they *actually received pensions*. The fact that they may not be able to articulate the criteria under which they qualified is in no way fatal to their claim.

found by a federal court to be without merit. If this were not the case, the federal courts would have fewer opportunities to judge the merits of disputed ERISA claims, since employers would on their own initiative reduce the number of claims filed by workers by threatening aggrieved workers with the denial of employment benefits not protected by ERISA.

### V. *Conclusion*

McVeigh's claim for pension rights that have vested in him through his employment with Dorrance is without merit, since McVeigh has not proven, by a preponderance of the evidence, that he participated in the pension plan he alleges Dorrance had established. McVeigh should have, however, been able to enjoy the severance pay plan established by the Executors in Dorrance's name without the undue burden of abandoning right to sue under ERISA. The appropriate order follows.

### ORDER

AND NOW, this 19th day of May, 1992 for the reasons set forth in the foregoing Opinion, IT IS ORDERED as follows:

1. Defendants are hereby directed to offer to plaintiff William McVeigh a severance payment of $51,000.

2. On all other claims by plaintiff brought under 18 U.S.C. 1001 *et seq.* ("ERISA"), judgment is hereby ENTERED in favor of defendants Philadelphia National Bank *et. al.*