**Donald E. BELSKY, Appellant,**

v.

**FIRST NATIONAL LIFE INSURANCE COMPANY, a Nebraska Corporation; Federal Deposit Insurance Corporation, Appellees.**

No. 86–1716.

United States Court of Appeals, Eighth Circuit.

Submitted March 9, 1987.

Decided May 12, 1987.

Rehearing and Rehearing En Banc Denied July 6, 1987.

Gary L. Dolan, Lincoln, Neb., for appellant.

John H. Bernstein, Omaha, Neb., for appellees.

Before LAY, Chief Judge, JOHN R. GIBSON, Circuit Judge, and HANSON,* Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

This appeal arises out of the insolvency and closing of the Bank of Cody and the Federal Deposit Insurance Corporation's (FDIC) acquisition of the Bank's assets as authorized by 12 U.S.C. § 1823(c)(2) (1982). Donald Belsky, the president of the Bank, brought an action against First National Life Insurance Company and the FDIC seeking a declaration of his rights to a life insurance policy owned by the Bank and an injunction preventing First National from paying the surrender value of the policy to the FDIC. Belsky claimed that the policy was an asset of the Bank's funded employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (1982), and that his rights in the plan became vested upon the plan's termination when the Bank of Cody closed. He argued that, as a plan asset, the policy could not be acquired by the FDIC. After a two-day

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

bench trial, the district court[1] denied relief and entered judgment for the FDIC. The central issue on appeal is whether the district court erred in concluding that the Executive Compensation Plan, which provided retirement and death benefits for certain Bank executives, including Belsky, was not a funded plan and therefore not covered by ERISA. We hold that the district court did not err in so concluding, and affirm its judgment.

Donald Belsky started work for the Bank of Cody in July 1971 and became its president in 1975 and a director in about 1977. He held these positions until the Nebraska Department of Banking and Finance declared the Bank insolvent and closed it on October 24, 1984. In 1982, the Bank adopted the Executive Compensation Plan proposed by the First National Life Insurance Company. Under the Plan, the Bank entered into separate salary continuance agreements with each of its key employees, agreeing to provide each employee and his or her beneficiaries with retirement, disability, and death benefits. The Plan also called for the Bank to purchase a life insurance policy on each participating employee to cover the cost of providing the benefits. Salary continuance agreements were signed by most, if not all, of the Bank's officers, and the Bank purchased life insurance policies on the officers' lives. Belsky signed salary continuance agreements with the Bank on March 2, 1982 and on May 8, 1984. On March 2, 1982, First National issued a $250,000 policy on Belsky's life. The coverage was increased to $350,000 in September 1983 and to $525,000 in May 1984. The Bank paid a large initial premium for each policy and an additional premium for each increase. According to the insurance company representative responsible for the Plan, the Bank could pay its obligations under the salary continuance agreements either by using the cash value of the policy or by using other funds. As with all of the policies, the Bank was the owner and beneficiary of Belsky's policy; if the Bank had requested the cash surrender value of the policy, the insurance company would have paid it.

When the Bank closed, the FDIC was appointed as its receiver and sold certain assets of the Bank to a new entity, Guardian State Bank. Pursuant to 12 U.S.C. § 1823(c)(2)(A), the FDIC, in its corporate capacity, purchased from the FDIC, as receiver, all of the remaining assets of the Bank of Cody. In July 1985, Belsky sought a declaratory judgment holding that he was the owner of the First National life insurance policy that the Bank had purchased on his life. He also sought a preliminary and permanent injunction preventing First National from paying the cash surrender value of the policy to the FDIC. He asserted that the Bank's Executive Compensation Plan was a "funded retirement benefit plan," and, therefore, under ERISA he had a protected interest in the life insurance policy. The district court granted a preliminary injunction enjoining the termination of the policy or the transfer of its cash value to anyone other than Belsky. After a two-day bench trial, the district court entered judgment for the FDIC. The court held that the salary continuance agreement was unfunded and, thus, the Executive Compensation Plan was not covered by ERISA.[2] Specifically, the district court held that paragraph 10 of the salary continuance agreement "shows that the parties did not interpret the policy as creating a separate res to which Belsky could look if the Bank failed to pay the promised retirement benefits." *Belsky v. First Nat'l Life Ins. Co.*, 653 F.Supp. 80, 84 (D.Neb.1986).

---

1. The Honorable Warren K. Urbom, United States District Judge, District of Nebraska.

2. As an affirmative defense, the FDIC aserted that Belsky's claim to the insurance policy was barred by 12 U.S.C. § 1823(e). The district court agreed, finding that the salary continuance agreement was not approved by the Bank's board of directors and Belsky's asserted interest in the life insurance policy was not evidenced in writing as required by 12 U.S.C. § 1823(e). The district court held that, consequently, the agreement could not operate to diminish or defeat the FDIC's right, title, or interest in the policy. *See* 12 U.S.C. § 1823(e). In light of our decision as to Belsky's asserted claim under ERISA, we need not reach this issue.

## I.

Whether Belsky has a claim to the insurance policy turns on whether the Executive Compensation Plan was "funded" within the meaning of ERISA. Belsky concedes that the Plan is an "excess benefit plan" as defined in ERISA, 29 U.S.C. § 1002(36), and that such a plan, if unfunded, is outside the scope of Title I of ERISA. *See* 29 U.S.C. § 1003(b)(5). He asserts, however, that the resolution of this issue is controlled by our decision in *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208 (8th Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981).

In *Dependahl*, the Falstaff Brewing Corporation instituted a whole-life insurance plan for some of its high ranking executives. Under this plan, the named beneficiaries of a covered executive would receive annuity income benefits upon the executive's death, with Falstaff recovering the annual premiums it had previously paid, with interest. *Id.* at 1213. Unlike the Executive Compensation Plan at issue here, the Falstaff plan did not provide retirement or disability benefits; it was strictly a death benefits plan. Significantly, the event that triggered the company's obligation to pay under the *Dependahl* agreement was the same event that triggered the life insurance company's obligation to pay under the life insurance policy, namely, the death of the employee. The district court found that the plan was funded, reasoning that a plan is funded when benefits are paid through a specific insurance policy and unfunded when they are paid from the employer's general assets. *Dependahl v. Falstaff Brewing Corp.*, 491 F.Supp. 1188, 1195 (E.D.Mo.1980). This court affirmed the district court, concluding that:

> Funding implies the existence of a *res* separate from the ordinary assets of the corporation. All whole-life insurance policies which have a cash value with premiums paid in part by corporate contributions to an insurance firm are funded plans. The employee may look to a *res* separate from the corporation in the

event the contingency occurs which triggers the liability of the plan.

653 F.2d at 1214.

Belsky's agreement with the Bank is in sharp contrast to the terms of the *Dependahl* plan. First, in addition to death benefits, Belsky's agreement also provides for retirement and disability benefits. *See Belka v. Rowe Furniture Corp.*, 571 F.Supp. 1249, 1252 (D.Md.1983) (noting that the life insurance policy would fund the employer's liability only in rare instances; ordinarily, the company would pay the benefits out of its general assets). More importantly, the agreement does not mandate that the Bank had or would acquire assets to finance the liabilities assumed in the agreement. While it is evident that the Bank obtained the insurance policy with the intention that it could be used in funding the Plan, the language of the Plan, unlike that of the *Dependahl* plan, specifically avoids making a direct tie between the insurance policy and the Plan. This makes paragraph 10, the provision of the agreement that describes Belsky's relation to the policy, particularly significant:

> The rights of the Executive or any beneficiary of the Executive shall be solely those of an unsecured creditor of the Bank. If the Bank shall acquire an insurance policy or any other asset in connection with the liabilities assumed by it hereunder, then, except as otherwise expressly provided, such policy or other asset shall not be deemed to be held under any trust for the benefit of the Executive or his/her beneficiary or to be collateral security for the performance of the obligations of the Bank, but shall be, and remain, a general, unpledged, unrestricted asset of the Bank.

Designated Record at 31.

The district court specifically relied on this paragraph in determining that Belsky's plan was unfunded. We are satisfied that the district court correctly read the agreement between Belsky and the Bank. Under the plan as drawn, the cash value of the policy simply became a general, unpledged, unrestricted asset of the Bank and those Bank assets in turn would be used to

fund Belsky's plan. Thus, we cannot conclude that the district court erred in finding that there was no *res* separate from the corporation to which Belsky could look to satisfy the liability of the plan. In short, the Bank's plan so differs from the one in *Dependahl* that *Dependahl* is not controlling.

Belsky asks that we consider the *Dependahl* agreement—a copy of which was not presented to the district court—and compare it to the agreement at issue here. He argues that the provisions in the *Dependahl* agreement are identical to those that are the basis for his claim, pointing to language in the *Dependahl* agreement stating that the insurance company has no liability except as set forth in the policies. We would hesitate to rely on an exhibit not before the district court as a basis for reversing the district court's decision. However, our study of the *Dependahl* agreement underscores our conclusion that the district court correctly analyzed Belsky's agreement. The *Dependahl* death benefit agreement specifically provided that Falstaff had secured the obligations by purchasing life insurance on the life of the employee. It also stated that the amount of the benefit equaled the difference between the insurance proceeds received by Falstaff when the employee died and the amount of the premiums that Falstaff had paid out, plus 3% interest. Significantly, Falstaff, unlike the Bank in this instance, did not reserve the right to treat this as a general, unpledged, unrestricted asset. *See* Pl.Exh. 55, *Dependahl v. Falstaff Brewing Corp.*, 491 F.Supp. 1188 (E.D.Mo.1980).

The district court correctly concluded that the plan represented in the salary continuance agreement is "unfunded," and Belsky has no claim under ERISA to the life insurance policy. Accordingly, there is no impediment to the FDIC's acquisition of the surrender value of the Bank's life insurance policy on Belsky.

We affirm the decision of the district court.