William COLARUSSO, Plaintiff,

v.

TRANSCAPITAL FISCAL SYSTEMS, INC. Top Hat Value Added Plan; Transcapital Fiscal Systems, Inc.; Transcapital Warranty Corporation; Estate of Eugene T. Day, Jr.; James Mulligan; Richard C. Gardner; Connelly Campion Wright, Inc.; and John Does 1–20, Defendants.

No. CIV.A.99–2394(JWB).

United States District Court, D. New Jersey.

Aug. 27, 2002.

Lowenstein Sandler, By Thomas E. Redburn, Jr., Esquire, Roseland, for Plaintiff.

Michael J. Strenk, Esquire, Commack, NY, for Defendants Estate of Eugene T. Day, Jr. and Transcapital Insurance Company.

Giordano, Halleran & Ciesla, By Catherine Bick, Esquire, Middletown, for Defendants Connelly–Campion–Wright, Inc. and Richard C. Gardner.

## *OPINION*

BISSELL, Chief Judge.

Following the conclusion of a bench trial in the above-captioned matter, Plaintiff William Colarusso ("Plaintiff" or "Colarusso") and the one remaining Defendant in the action, Estate of Eugene T. Day, Jr. ("Day"), submitted post-trial memoranda of law on the issue of Day's liability.[1] Plaintiff alleges that Day violated Section 502(c)(1) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1132(c)(1)(B), for failure to provide information related to the employee benefit plan in which Plaintiff was a participant and Day was an administrator. Accordingly, Plaintiff requests that the Court impose civil penalties against Day in the maximum amount of $100.00 per day from the time of Plaintiff's request for information to the present. To determine whether Day is liable to Plaintiff the Court must answer the following questions:

1) Was the employee benefit plan at issue covered by ERISA regulations?

2) If the plan was an ERISA plan, did it impose fiduciary duties?

3) If the plan was an ERISA plan and imposed fiduciary duties, was Defendant Day a fiduciary to the plan as defined by ERISA?

4) If the plan was an ERISA plan, imposed fiduciary duties, and Day was a fiduciary, is Day subject to the penalty provision of 29 U.S.C. § 1132(c)(1)(B) for failing to furnish Plaintiff Colarusso with plan-related information in violation of ERISA regulations?

5) If the plan was an ERISA plan, imposed fiduciary duties, Day was a fiduciary, and Day is subject to the penalty provision of 29 U.S.C. § 1132(c)(1)(B), what is the appropriate per diem penalty and should penalties be imposed upon his estate only up to the date of his death or beyond?

## *FACTS*

### I. *Procedural History*

Plaintiff Colarusso filed a Complaint on May 25, 1999 against Defendants Transcapital Fiscal Systems, Inc. Top Hat Value Added Plan, Transcapital Fiscal Systems,

---

1. The Court has decided to resolve this issue upon the papers submitted, without further oral argument.

Inc., Transcapital Warranty Corp., Estate of Eugene T. Day, Jr., James Mulligan, Richard C. Gardner ("Gardner"), Connelly Campion Wright, Inc. ("CCW"), and John Does 1–20 (unidentified members of the Board of Directors of Transcapital and Transcapital Warranty), alleging violations of ERISA and a pendant state law claim for unpaid commissions earned by Plaintiff. Plaintiff did not pursue his claims against the Transcapital Defendants nor James Mulligan, the president of Transcapital following Day's death in February 1997, because the company filed for bankruptcy protection in the United States Bankruptcy Court for the Eastern District of New York during the instant litigation. Defendant Gardner was an insurance agent who played a key role in the creation of the Plan. CCW is the agency for which Gardner worked. After the bench trial, the Court issued an oral opinion and order on January 11, 2002 dismissing Plaintiff's claims in Counts I and III of his Complaint against Defendants CCW, Gardner and Day as time-barred by the applicable statute of limitations. However, Plaintiff's claim in Count II of his Complaint against Day demanding the imposition of penalties pursuant to 29 U.S.C. § 1132(c)(1)(B) remained. The Court will herein resolve the issue of Day's liability based on the trial record and the post-trial memoranda submitted by the parties.

II. *Background*

Plaintiff Colarusso was an employee of Transcapital Fiscal Systems, Inc. ("Transcapital") from in or about 1986 until November 1993. On December 15, 1987, Day, Gardner and Douglas Brown, a representative of CIGNA Financial Advisors, proposed a retirement plan to a select group of Transcapital employees, including Colarusso, and distributed documents summarizing the proposed plan. The Transcapital Fiscal Systems, Inc. Top Hat Value Added Plan (the "Plan") included a Summary Plan Description ("SPD"), Summary Plan Projection, Corporate Resolution, Top Hat Value Added Plan Corporate Document, and Salary Continuation Document. The SPD provided that the effective date of the Plan was December 23, 1987. Plaintiff asserts that the Plan was to be established as follows: Transcapital would purchase an insurance policy on Plaintiff's life in the face amount of $950,000.00. While Transcapital was to own the insurance policy, Plaintiff was to own the cash value of the program. The life insurance policy would have an annual premium of $10,000.00. To pay the annual life insurance premium, Transcapital was to deduct $5,000.00 per year from Plaintiff's salary and then pay a 100% matching contribution. The program was to run for ten years after which the premium would stop and the policy would be owned entirely by the employee. From the documents submitted with the SPD it appears that if the employee were to die during the ten year premium payment schedule, the employer would be entitled to the death benefit and the employee's beneficiaries would be entitled to the remaining cash value.

Pertinent facts listed in the SPD include: the Plan administrator was Eugene T. Day, Jr.; eligibility for the Plan would be determined by the Board of Directors; Transcapital would match each dollar contributed by the employee at a ratio of 100%; and vesting would be 100% upon entering the Plan. The SPD further provided that the employee owns the cash value of the program and, at the end of the premium payment schedule, the employee could either (1) cancel the policy and take its cash value, (2) convert the policy's cash value to an annuity, (3) elect paid-up life insurance coverage, (4) continue paying premiums under the policy, or (5) elect

paid-up insurance coverage and take tax-free annual loans from the policy for life.

On or about March 3, 1988, Plaintiff enrolled in the Plan by signing a form authorizing bi-weekly deductions from his wages in the amount of $250.00 to be contributed to the Plan. Plaintiff asserts that for the next three years, the Plan appeared to operate as represented in the SPD. During each of the three years, Transcapital deducted $5,000.00 from Plaintiff's wages as his contribution toward the costs of the insurance policy and then matched that contribution. In addition, Transcapital contributed an extra $13,853.00 of Plaintiff's money to the Plan in lieu of commissions and bonus. Day periodically arranged for an "account statement" to be sent to Plaintiff showing the status of his benefits under the Plan.

However, by adopting the arguments presented by Defendants CCW and Gardner in their Trial Memorandum, Defendant Day asserts that no plan was ever actually established. Day acknowledges that the transactions initially contemplated that the cash value was to be owned by the employee and the death benefit by the employer. Defendant also acknowledges that although the policies were issued with Transcapital as owner and beneficiary, policy ownership was to be changed once the requisite legal documents were drafted and signed by lawyers for Transcapital. However, such documents were never completed. Accordingly, Defendant asserts, Transcapital remained the owner and beneficiary of the Plan. Thus, Defendant maintains that only a life insurance policy was established, not an employee benefit plan subject to ERISA regulations.

In late 1990, Day informed Gardner that Transcapital was experiencing financial problems and could not continue making the payments to the Plan that he was presently making. Day was advised to determine what the mortality charges on the life insurance would be and pay at least that portion of the premium. Thereafter, Day explained his financial situation to each participant in the Plan, including Plaintiff, and informed them that he was "cancelling" the matching contribution aspect of the Plan. Thereafter, deductions from Plaintiff's account ceased. Plaintiff asserts that Transcapital did continue to pay the policy premiums to keep the policy and the Plan in force.

In or about 1990 or 1991, a few individuals left Transcapital and took some of the cash value from their life insurance policies as they requested. Plaintiff claims that upon voluntarily leaving Transcapital in November 1993, he made several inquiries to Day and Gardner regarding his rights under the Plan and requested a policy summary and statement of his nonforfeitable benefits and options. Plaintiff alleges that out of frustration at the failure of Day and Gardner to respond, he sent requests for information about the Plan directly to CIGNA, the company that issued the insurance policies. On March 17, 1994, Gardner sent Plaintiff a letter notifying him of the status of his policy. Enclosed with the letter was an election form providing Plaintiff with the option to pay the premiums himself and have the life insurance policy transferred to his name, or, in the alternative, to reject the transfer of the policy and allow the policy to be returned to CIGNA. Gardner asserts that he never received the signed form from Plaintiff and never knew whether the form was returned to Day. Therefore, in or about June 1994, at Day's request, Gardner sent Day the cash surrender forms for the life insurance policy on Plaintiff. Day signed the surrender forms in July 1994 and returned them to Gardner who signed as a witness. Gardner then forwarded the

forms to CIGNA and requested that they be cashed in.

Plaintiff acknowledges that he received the letter of March 17, 1994 with an election form regarding a transfer of ownership of the policy. While Plaintiff does not assert that he returned a completed form to either Day or Gardner, he claims that he spoke with Gardner several times throughout March and April 1994. Plaintiff also asserts that Gardner told him that Day had not yet authorized the release of the policy to Plaintiff even though Gardner had previously told him that Transcapital would transfer the ownership of the policy to him if Plaintiff so elected. Plaintiff further claims that Gardner told him not to worry about paying the insurance premium on the policy because Transcapital was paying it for him.

In his certification in support of his opposition to Garnder and CCW's motion for summary judgment, Plaintiff asserts that on or about June 20, 1994, he asked Day via telephone to provide information and documentation relating to the Plan, including: (1) an insurance policy summary with an individual account statement for his account under the Plan; (2) a list of his nonforfeitable benefits and options; and (3) copies of all documents relating to the Plan that were signed by him. Plaintiff further claims that in response, Day indicated he had no reason to cooperate with Plaintiff and stated that the Plan would remain in place for the ten year period as originally contemplated, at the expiration of which Plaintiff could exercise his rights under the Plan. Plaintiff asserts that he never received the information he requested.

At trial, Plaintiff testified that after leaving several messages for Day, he finally spoke with him around June 20, 1994. Plaintiff testified that he reminded Day that he had been asking for his "plan summary lists of nonforfeiture benefits, [his] options and that they had not yet been provided." (January 8, 2002 Transcript, 46:7–9). Plaintiff further testified that Day told him that "as far as he's concerned it's a ten year plan and he's going to have [Plaintiff] wait for the ten years to complete. At the end of the ten years he would turn it over to [Plaintiff]." (January 8, 2002 Transcript, 46:9–12).

The ten year premium payment schedule expired in December 1997. Plaintiff testified at trial that prior to that date, in October and early December 1997, he wrote to James Mulligan, then-president of Transcapital, requesting that the policy be turned over to him. Plaintiff never received a response from Mulligan and only after filing the instant suit did Plaintiff learn that his policy had been cashed in at the direction of Day in July 1994.

Plaintiff alleges that the Plan at issue in the instant case is an employee welfare benefit plan, an employee pension benefit plan, or a combination of both within the meaning of ERISA, and therefore, the Plan imposes duties upon its fiduciaries. Plaintiff claims that Day was a fiduciary to the Plan and that he is subject to the penalty provision of 29 U.S.C. § 1132(c)(1)(B) for failing to provide the information Plaintiff requested concerning the Plan and/or information regarding modifications made to the Plan. Accordingly, Plaintiff alleges Day is liable to Plaintiff for civil penalties in the amount of $100.00 per day since June 20, 1994, the date of Plaintiff's request for the information.

### ANALYSIS

I. *The Transcapital Fiscal Systems, Inc. Top Hat Value Added Plan was an Employee Benefit Plan Subject to ERISA Regulations*

■ Defendant Day argues that ERISA does not apply to the transactions

at issue because the alleged plan was never actually established. While Defendant acknowledges that Transcapital obtained a policy insuring Plaintiff's life, Defendant denies that the policy was part of the Plan pursuant to which Plaintiff alleges he should have received benefits. Rather, Defendant asserts that because Transcapital failed to execute certain plan documents, nothing more than an insurance policy existed. Based on Congress' liberal interpretations of ERISA's application to employee benefit plans and the relevant evidence submitted by Plaintiff and Defendant, the Court finds that the Transcapital Fiscal Systems, Inc. Top Hat Value Added Plan in which Plaintiff participated was subject to ERISA regulations.

ERISA covers "employee benefit plans," defined as "employee pension benefit plans," "employee welfare benefit plans," or a plan which is both an employee pension benefit plan and an employee welfare benefit plan. 29 U.S.C. § 1002(3). ERISA coverage of a particular employee benefit plan is contingent on the presence of five elements: (1) a plan, fund, or program; (2) established or maintained; (3) by an employer and/or employee organization engaged in commerce or in any industry affecting commerce; (4) for the purpose of certain specified benefits (depending on whether it is a pension benefit plan, welfare benefit plan, or a combination of the two); (5) to participants or beneficiaries. 29 U.S.C. § 1003(a); ERISA PRACTICE AND PROCEDURE, 2d Ed., Vol. 1, § 2:2.

It is uncontested that Transcapital was an industry affecting commerce. What is at issue is whether the purchase of insurance on the life of Plaintiff and the subsequent funding according to the terms of the SPD constitute an employee benefit plan established or maintained by Transcapital.

In his Complaint, Plaintiff claims that Transcapital established and maintained for him an "employee pension benefit plan." (Cmplt.¶ 4). However, in his Trial Memorandum Plaintiff asserts that the Plan contained elements of both an employee pension benefit plan and an employee welfare benefit plan. ERISA defines an employee pension benefit plan as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer ... to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A). The plan, which constitutes a separate entity from the employer, generally accumulates funds by means of specified employer contributions (although some plans may allow employee contributions), which it invests and accumulates with interest plus any returns from the investments. Payments or distributions may take a variety of forms, including a monthly benefit, or they may be in the form of a lump sum distribution. The range of programs falling within the definition of a pension plan can be quite broad and can go beyond the traditional concept of a typical defined benefit or defined contribution pension program. *See* ERISA PRACTICE AND PROCEDURE, 2d Ed., Vol. 1, § 2:4.

ERISA defines an employee welfare benefit plan as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer ... to the

extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions or retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1).

The Plan in which Plaintiff enrolled provided for benefits in the form of deferred income as well as death benefits to his beneficiaries. Accordingly, the Court agrees that the Plan contains elements of both an employee pension benefit plan and an employee welfare benefit plan. Furthermore, the Court notes that a comparison of the statutory definitions of a welfare plan and a pension plan reveals that the only significant difference between these varieties of employee benefits plans is the nature of the benefit furnished—a pension plan provides retirement income or other deferred income, while a welfare plan provides benefits upon the occurrence of various specified contingencies. *See* ERISA PRACTICE AND PROCEDURE, 2d Ed., Vol. 1, § 2:5. Additionally, regardless of whether considered a welfare plan, a pension plan, or a combination of both, Defendant argues that no plan was ever established or maintained. Thus, the Court finds that the characteristics of the Plan are not at the crux of the decision as to whether the transactions at issue should be subject to ERISA. Accordingly, in deciding whether the Plan in which Plaintiff enrolled is subject to ERISA, the Court will consider the characteristics of both welfare and pension plans.

Whether a plan exists within the meaning of ERISA is "a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person." *Deibler v. United Food and Commercial Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir.1992). The court in *Weinstein v. Paul Revere Ins. Co.*, 15 F.Supp.2d 552, 556 (D.N.J.1998) held that "the reality of the plan is determinative." Defendant Day asserts that the reality of the transactions at issue in the instant case is that there were no fully executed documents establishing an employee benefit plan. However, to determine the reality of the plan, this Court must apply the method set forth by the Eleventh Circuit in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir.1982), and adopted by the District of New Jersey in *Weinstein*, 15 F.Supp.2d 552. This method requires a court to determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures of receiving benefits. *See Donovan*, 688 F.2d at 1373.

Congress enacted ERISA to protect employees from abuses in the administration and investment of private retirement plans and employee welfare plans. ERISA established minimum standards for vesting of benefits, carrying out of fiduciary responsibilities, reporting to the government, and making disclosures to participants. *See id.* at 1367 (citing H.R.Rep. No. 93–533, 93d Cong.2d Sess., reprinted in 1974 U.S.Code Cong. and Admin. News 4639). Coverage under ERISA is construed liberally to provide the maximum degree of protection to working men and women covered by private retirement programs. *See* S.Rep. No. 93–127 (1973), reprinted in 1974 U.S.Code Cong. and Admin. News 4639, 4854. Given that purpose and con-

struction, the *Donovan* court held that "it would be incongruous for persons establishing or maintaining informal or unwritten employee benefit plans, or assuming the responsibility of safeguarding plan assets, to circumvent the Act merely because an administrator or other fiduciary failed to satisfy reporting or fiduciary standards." *Donovan,* 688 F.2d at 1372.

The court in *Donovan* specifically held that ERISA does not require a formal written plan, but rather, covers any employee benefit plan if it is established or maintained by an employer who is engaged in any activity or industry affecting commerce. *Id.* For example, in *Moeller v. Bertrang,* 801 F.Supp. 291 (D.S.D.1992), the South Dakota District Court found that an oral promise by an employer to pay employees with five years of service $1,000.00 for each year worked until their retirement was an ERISA-covered pension plan. The court found that a reasonable person could ascertain the intended benefits and beneficiaries, the source of financing, and plan procedures. Further supporting a finding that the plan was subject to ERISA regulations, the Court found that the plan mirrored ERISA's vesting schedule and the employer paid the promised benefit to at least one other employee. *Moeller,* 801 F.Supp. 291. In *James v. National Business Systems,* 721 F.Supp. 169 (N.D.Ind.1989) (*vacated on other grounds by* 924 F.2d 718 (7th Cir.1991)), the Northern District of Indiana held that an executive compensation plan funded by life insurance policies to provide retirement income to certain management personnel was an ERISA-covered plan, even in the absence of a written plan, because failure to adhere to ERISA's requirements

does not exempt the employer from coverage by the Act.[2]

First and foremost, applying the rationale espoused in *Donovan,* 688 F.2d 1367, and relied upon in *Moeller,* 801 F.Supp. 291, and *James,* 721 F.Supp. 169, the Court rejects Defendant's argument that the transactions carried out by Transcapital constituted only the purchase of life insurance because Transcapital failed to execute the documents necessary to "establish" a benefits plan that would be subject to ERISA. Rather, the Court must look to the circumstances surrounding the establishment and maintenance of the Transcapital Fiscal Systems, Inc. Top Hat Value Added Plan to determine whether Transcapital intended to provide benefits on a regular long-term basis and assumed some responsibility for the administration of the program or whether, as Defendant asserts, nothing more than a life insurance policy existed. Indeed, while merely allowing an employee to purchase insurance even if it is financed by payroll deductions, does not constitute a plan subject to ERISA, *see* ERISA PRACTICE AND PROCEDURE, 2d Ed., Vol. 1, § 2:5, the purchase of insurance is evidence of the existence of a plan, fund or program. In the instant case, Transcapital purchased the insurance policy for Plaintiff and contributed to the funding. In *Gahn v. Allstate Life Insurance Co.,* 926 F.2d 1449 (5th Cir.1991), the Fifth Circuit applied a two-part test to determine whether an insurance policy purchased by the owner of the employer was an ERISA-covered plan. First, the court held a plan is not an ERISA-covered plan only if (1) the employer did not contribute to the plan, (2) participation was voluntary, (3) the employer's involvement

---

**2.** The parties have not cited and this Court has not found cases in the District of New Jersey or the Third Circuit analogous to the case before this Court. While *Moeller,* 801 F.Supp. 291, *James,* 721 F.Supp. 169, and the

other cases outside the Third Circuit cited by this Court are not controlling, this Court finds that the cases do provide guidance for the issues raised herein.

in the plan was limited to collecting premiums and remitting them to the insurance company, *and* (4) the employer received no profit from administering the plan. Second, if the plan does not meet all four requirements for exemption from ERISA, the court must determine whether from the surrounding circumstances, a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing and the procedure for receiving benefits. *Gahn,* 926 F.2d 1449.

In the instant case, it is uncontested that the employer contributed to the Plan. Additionally, the president of Transcapital, Defendant Day, acted as the administrator of the Plan, not a mere collector of premiums. Thus, the Plan is not exempt from ERISA under the four criteria established in *Gahn,* 926 F.2d 1449. Furthermore, this Court concludes that from the surrounding circumstances, a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits. This Court finds that a reasonable person could conclude that the intended benefits of the Plan were deferred income or death benefits; the intended beneficiaries were a selected class of employees and their designated beneficiaries; the source of financing was the purchase of a life insurance policy by Transcapital funded by a portion of Plaintiff's salary and matching contributions by Transcapital; and the procedure for receiving benefits was one of the options conveyed to Plaintiff in the SPD. Additionally, as the District of South Dakota found relevant in *Moeller,* 801 F.Supp. 291, it appears that other Transcapital employees recovered benefits under the Plan as certain employees who left Transcapital prior to Plaintiff's departure received the cash value of their policies.

For three years, Transcapital withdrew money from Plaintiff's salary and made matching contributions in accord with the terms of the SPD. Plaintiff received account summaries and was informed by Gardner, the insurance agent, of his options under the Plan which were the same as those listed in the SPD. Thus, the Court finds Day's failure to complete certain documents inconsequential to the establishment of a plan under ERISA. Looking to the surrounding circumstances, a reasonable person could find that, as in *James,* 721 F.Supp. 169, Day intended to establish a benefits plan because he proposed such a plan to a select group of employees and for three years funded the plan through insurance policies purchased on the lives of the employees. Even when Transcapital could no longer afford to make matching contributions for the premiums, Transcapital continued to maintain the Plan and told Plaintiff that it would continue to pay the premiums to cover the mortality rate. Moreover, in a letter from CIGNA to an investigator from the State of New Jersey Department of Insurance, a CIGNA representative stated that the "purpose of the plan was to provide 'retirement' benefits to executives at the end of ten years." The letter also discusses the presentation of the program and enrollment of the executives in "the plan." (Plaintiff's Trial Exh. 31). Thus, in light of all the surrounding facts and circumstances from the point of view of a reasonable person, the Court finds that the Transcapital Fiscal Systems, Inc. Top Hat Value Added Plan in which Plaintiff participated was an employee benefit plan within the meaning of ERISA and, therefore, subject to ERISA regulations.

II. *The Transcapital Fiscal Systems, Inc. Top Hat Value Added Plan is Not Exempt from ERISA Fiduciary Requirements*

The fiduciary rules of ERISA apply to most employee benefit plans. However,

the following employee benefit plans are exempt from coverage: (1) unfunded plans for deferred compensation for select management or the highly compensated (frequently referred to as "top hat plans"); (2) investment company assets that are not plan assets; (3) insurance company assets that are not plan assets; and (4) plans exempted under 29 U.S.C. § 1003(b), such as governmental plans, church plans, and unfunded excess benefit plans. 29 U.S.C. § 1101. Defendant Day, again adopting the arguments in the Trial Memorandum of Defendants Gardner and CCW, asserts that the Plan at issue before this court is an unfunded plan for deferred compensation for a select groups of employees, and therefore, is not subject to the ERISA fiduciary rules. Plaintiff, however, contends that the Plan, although titled "Top Hat Value Added Plan" and established for select highly compensated employees, is not a true top hat plan because it was funded through the purchase of a life insurance policy on Plaintiff's life. Therefore, Plaintiff argues that the Plan does not meet the requirements for exemption from ERISA's fiduciary provisions.

In *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1214 (8th Cir.1981), the Eighth Circuit found that funding implies the existence of a res separate from the ordinary assets of the corporation. All whole-life insurance policies which have cash values with premiums paid in part by corporate contributions to an insurance firm are funded plans. The employee may look to a res separate from the corporation in the event a contingency occurs that triggers the liability of the plan. *Id.*

However, Defendant Day asserts that *Belsky v. First National Life Insurance, Co.*, 818 F.2d 661, 663 (8th Cir.1987) and *Miller v. Heller*, 915 F.Supp. 651, 660 (S.D.N.Y.1996) provide appropriate guidance for this Court to find that the Plan in the instant case was an unfunded plan for deferred compensation which, therefore, did not impose fiduciary duties. In *Belsky*, the court ultimately relied upon language in the plan at issue which stated "[t]he rights of the Executive or any beneficiary of the Executive shall be solely those of an unsecured creditor of the [employer]," to find that the plan was unfunded. *Belsky*, 818 F.2d at 663. The employer in *Belsky* purchased a life insurance policy that would accrue a cash surrender value to finance the plan. However, the drafters of the plan specifically avoided making a direct tie between the insurance policy and the plan, stating in the plan itself that an insurance policy or other asset acquired in connection with the liabilities assumed by the employer "shall be, and remain, a general, unpledged, unrestricted asset of the [employer]." *Id.* Based on that language, the court concluded that instead of providing the employee with any rights in the insurance policy, the cash value of the policy became a general, unpledged, unrestricted asset of the employer and those assets in turn would be used to fund the employee's plan. *Id.*

As in *Belsky*, the *Miller* court held that where the language of the plan expressly avoids making a direct tie between the insurance policy and the deferred compensation plan, the court must enforce the terms of the plan regardless of the fact that the purpose of the insurance policy was to fund the plan. The court treated the insurance policy and the deferred compensation plan as two separate plans and concluded that the deferred compensation plan was unfunded. *Miller*, 915 F.Supp. at 660. The *Miller* court focused on the language in the plan stating "[t]he rights of the Executive to the Deferred Compensation and of the Beneficiary ... shall solely be those of unsecured creditors of [the employer]." *Id.* In the instant case, Defendant can point to no language in the

documents relating to the Plan parallel to the language in *Belsky* and *Miller* upon which those courts based their decision. Therefore, the Court is unpersuaded by Defendant's comparisons.

Defendant maintains that because Transcapital retained ownership of the insurance policy and the benefits, all funding was from the general assets of Transcapital and Plaintiff had no rights in the Plan. However, Defendant cites no language and this Court finds no language in the agreement, funding plan or SPD suggesting that the cash value would be a general asset of Transcapital. Rather, it is undisputed that the cash value of the program was to be owned by Plaintiff upon entering the Plan. Furthermore, at the end of ten years, Plaintiff was to receive ownership of the policy itself, not merely some payment from Transcapital out of general corporate assets. That Day did not execute certain Plan documents does not alter the Court's finding of the reality of the Plan that existed. As the *Dependahl* court held, this Court agrees that "defendant[ ] may not avoid the requirements of ERISA by merely failing to comply and then arguing that the plan is not within ERISA due to their noncompliance." *Dependahl*, 491 F.Supp. at 1195. The Plan was set up such that it had a res separate from Transcapital's assets to which Plaintiff was to look as a source of funding benefits under the Plan, i.e., the insurance policy purchased on Plaintiff's life. Accordingly, the Plan was funded and is therefore not exempt from the fiduciary duties ERISA imposes.

III. *Defendant Day was a Fiduciary to the Transcapital Fiscal Systems, Inc. Top Hat Value Added Plan as Defined by ERISA*

ERISA imposes personal liability on any person who is a fiduciary to a plan who breaches any of the responsibilities, obligations, or duties imposed upon ERISA fiduciaries. 29 U.S.C. § 1109(a). A person is an ERISA fiduciary if, with respect to an ERISA plan:

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

The test of who is a fiduciary hinges on whether one possesses or exercises the requisite discretionary control, authority or responsibility in the management or administration of the plan. *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 233–34 (3d Cir.1994). If a service provider performs tasks that are purely ministerial or clerical, a finding of fiduciary status is unlikely. However, the term "fiduciary" is to be liberally interpreted to effect the remedial purposes of ERISA, and courts have taken a broad view in deciding whether a particular person should be considered a fiduciary. ERISA PRACTICE AND PROCEDURE, 2d Ed., Vol. 1, § 6:2; *see, e.g., Brink v. DaLesio*, 496 F.Supp. 1350 (D.Md.1980).

The Court finds that Defendant Day was a fiduciary to the Plan as defined by ERISA. First, Day was named as the Plan Administrator in the SPD. Second, as the Plan Administrator, Day exercised discretionary control over the Plan and its principal asset, the life insurance policies. Day, with the advice of Gardner, made all of the decisions concerning how the Plan

would be structured, which employees would be allowed to participate, what policies it would purchase, what benefits it would provide, whether Transcapital's matching contributions would continue, and when the Plan would end. Thus, Day acted as a fiduciary as defined by 29 U.S.C. § 1002(21)(A) and was therefore subject to the fiduciary requirements of ERISA.

IV. *Defendant Day is Subject to the Penalty Provision of ERISA, 29 U.S.C. § 1132(c)(1)(B), for Failing to Furnish Plaintiff Colarusso with Information which 29 U.S.C. § 1024(b)(1) Requires Plan Administrators to Provide to Plan Participants*

Under ERISA, 29 U.S.C. § 1132(c)(1)(B), a plan administrator faces personal liability to a plan participant for civil penalties in the amount of up to $100.00 per day for failure to provide information requested by the participant that ERISA regulations require the administrator to furnish. 29 U.S.C. § 1132(c)(1)(B)provides:

> Any administrator … who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100.00 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B).

In his certification in support of his opposition to Gardner and CCW's motion for summary judgment, Plaintiff asserts that on or about June 20, 1994, he asked Day via telephone to provide information and documentation relating to the Plan, including: (1) an insurance policy summary with an individual account statement for his account under the Plan; (2) a list of his nonforfeitable benefits and options; and (3) copies of all documents relating to the Plan that were signed by him. Plaintiff further claims that, in response, Day indicated he had no reason to cooperate with Plaintiff and stated that the Plan would remain in place for the ten year period as originally contemplated, at the expiration of which Plaintiff could exercise his rights under the Plan. Plaintiff asserts that he never received the information he requested.

As noted previously in this Opinion, Plaintiff testified at trial that after leaving several messages for Day, he finally spoke with him around June 20, 1994. Plaintiff testified that he reminded Day that he had been asking for his "plan summary lists of nonforfeiture benefits, [his] options and that they had not yet been provided." (January 8, 2002 Transcript, 46:7–9). Plaintiff further testified that Day told him that "as far as he's concerned it's a ten year plan and he's going to have [Plaintiff] wait for the ten years to complete. At the end of the ten years he would turn it over to [Plaintiff]." (January 8, 2002 Transcript, 46:9–12).

Plaintiff also testified that in December 1997, ten years after the Plan was established, he expected to take over the policy as provided in the plan documents. However, he discovered that his policy had been cashed in by Transcapital in July 1994. (January 8, 2002 Transcript, 52:10–19).

Plaintiff asserts that because Day failed to produce information which Plaintiff re-

quested and failed to notify him that the policy would be cashed in and the Plan cancelled, Defendant Day is subject to the penalty provision of 29 U.S.C. § 1132(c)(1)(B).

Defendant Day contends, however, that no ERISA regulations requiring the production of information were violated. Rather, Defendant contends that Plaintiff's request for information was effectively a request for a benefits statement and is therefore governed by 29 U.S.C. § 1025 which provides, in pertinent part:

(a) **Statement furnished by administrator to participants and beneficiaries.** Each administrator of an employee pension benefit plan shall furnish to any plan participant or beneficiary who so requests *in writing,* a statement indicating, on the basis of the latest available information -

(1) the total benefits accrued, and

(2) the nonforfeitable pension benefits if any, which have accrued, or the earliest date on which the benefits will become nonforfeitable.

(b) **One-per-year limit on reports.** In no case shall a participant or beneficiary be entitled under this section to receive more than one report described in subsection (a) during any one 12–month period.

29 U.S.C. § 1025 (emphasis added).

Defendant asserts that because 29 U.S.C. § 1025 requires that requests be in writing and Plaintiff made only an oral request, Defendant did not violate any provision subject to 29 U.S.C. § 1132(c)(1)(B) penalties, and, therefore, is not liable to Plaintiff.

Plaintiff contends, however, that the relevant information-producing provision of ERISA in the case at bar is 29 U.S.C. § 1024(b)(1), which does not require requests for information to be in writing:

If there is a modification or change described in [29 U.S.C. § 1022(a) ] ... a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan.

29 U.S.C. § 1024(b)(1).

Title 29 U.S.C. § 1022(a) provides, in pertinent part:

A summary of any material modification in the terms of the plan ... shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with [29 U.S.C. § 1024(b)(1) ].

29 U.S.C. § 1022(a).

■■■ The Court finds that requests for information described in 29 U.S.C. § 1024(b)(1) do not have to be in writing because the information described in that statute must be provided to participants and beneficiaries automatically upon the occurrence of certain events. Thus, no requests need be made at all to trigger a plan administrator's duty to provide such information. If, however, a request for information covered by 29 U.S.C. § 1024(b)(1) is made, a plan administrator must furnish the requesting participant or beneficiary with the pertinent information within in 30 days, as provided in 29 U.S.C. § 1132(c)(1)(B), rather than within the time allotted by 29 U.S.C. § 1024(b)(1) itself. *See, e.g., Dall v. The Chinet Co.,* 33 F.Supp.2d 26, 33–34 (D.Me.1998), *aff'd,* 201 F.3d 426 (1st Cir.1999).

In *Crotty v. Cook,* 121 F.3d 541 (9th Cir.1997), a case relied upon by Plaintiff, the Ninth Circuit found that where the plaintiff-participant orally requested information that the administrator was required to provide automatically pursuant

to 29 U.S.C. § 1024(b)(1), by not providing such information, the administrator was liable for civil penalties under 29 U.S.C. § 1132(c)(1)(B). *Crotty* involved the provision of 29 U.S.C. § 1024(b)(1) requiring an administrator to furnish to each participant a copy of the summary plan description within 90 days after he becomes a participant. The plan administrator failed to provide the plaintiff with a summary plan description within that 90 day period. Furthermore, the plan administrator failed to provide the plaintiff with the pertinent information even after he requested it. The court found that, even without any request, the administrator was required to provide a summary plan description to the plaintiff. Therefore, an oral request was sufficient to trigger the provisions of 29 U.S.C. § 1132(c)(1)(B). Accordingly, the court found the plan administrator was subject to the civil enforcement penalties of that statute.

Similarly, in *Davis v. Liberty Mutual Insurance Company*, 871 F.2d 1134 (D.C.Cir.1989), another case upon which Plaintiff relies, the court found that the administrator failed to provide a summary plan description to the plaintiff-participant pursuant to 29 U.S.C. § 1024(b)(1) within 90 days of the date upon which the plaintiff became a participant and, therefore, accordingly was liable for civil penalties under 29 U.S.C. § 1132(c)(1)(B). Once again, ERISA regulations required that the information at issue be automatically furnished without any request by a participant. Accordingly, whether the request was oral or written was of no consequence.

In the case at bar, the only information which had to have been automatically provided under 29 U.S.C. § 1024(b)(1) was information regarding the modification of the Plan. The Court agrees with Defendant that Plaintiff's request for an individual account statement and information

about his non-forfeitable benefits and options is governed by 29 U.S.C. § 1025(a) which requires that requests for such information be in writing. Furthermore, Plaintiff's request for an insurance policy summary and copies of all documents relating to the Plan that were signed by him is governed by 29 U.S.C. § 1024(b)(4), which also requires requests for such information to be in writing. 29 U.S.C. § 1024(b)(4) provides:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest update summary plan description, [,] and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the costs of furnishing such complete copies.

29 U.S.C. § 1024(b)(4). Plaintiff is not asserting that he never received an initial summary plan description as in *Crotty*, 121 F.3d 541, and *Davis*, 871 F.2d 1134. Rather, he is requesting copies of instruments under which the plan was established or operated of the sort covered by 29 U.S.C. § 1024(b)(4) and account statements and information about his non-forfeitable benefits and options covered by 29 U.S.C. § 1025(a). Thus, because Plaintiff only made an oral request for information covered by 29 U.S.C. §§ 1024(b)(4) and 1025(a), both of which require requests for information to be in writing, no civil penalties may be imposed upon Day pursuant to 29 U.S.C. § 1132(c)(1)(B) for his failure to provide the information requested by Plaintiff via his telephone conversation with Day on June 20, 1994.

■ Significantly, in his Post Trial Memorandum, Plaintiff does not argue that Day was required to furnish him with the actual information he requested, but

rather only that by requesting such information, Plaintiff triggered Day's duty to provide information regarding any modifications to the Plan. Plaintiff asserts that, because Day knew, at the time Colarusso requested information about his non-forfeitable options and rights under the Plan, that Transcapital was in the process of modifying the Plan by terminating it and surrendering Plaintiff's life insurance policy to CIGNA, Day was required to provide a summary description of this modification to Plaintiff. Furthermore, Plaintiff asserts that although 29 U.S.C. § 1024(b)(1) gives administrators 210 days from the end of the plan year to provide participants with a description of modifications to the plan, courts construing 29 U.S.C. § 1024(b)(1) and 29 U.S.C. § 1132(c)(1)(B) together have concluded that, if a participant requests information about the modification or change before the 210 day statutory deadline, the administrator must provide the required description within 30 days of the participant's request. *See, e.g. Dall,* 33 F.Supp.2d at 33–34. Thus, Plaintiff argues that Day was required to provide a summary description of this modification to Colarusso within 30 days of Plaintiff's request for information on June 20, 1994. Generally, to trigger the 29 U.S.C. § 1132(c)(1)(B) penalty, Plaintiff must demonstrate that he requested modifications to the Plan and that Day failed to comply with his request.

 Usually, the civil penalty provision of 29 U.S.C. § 1132(c)(1)(B) applies, and an administrator has 30 days to comply with the request, only if the participant to the plan specifically requests something that he was entitled to receive. *See, e.g., Dall,* 33 F.Supp.2d at 34–35; *Brooks v. Metrica, Inc.,* 1 F.Supp.2d 559, 568 (E.D.Va.1998); *Williams v. Caterpillar, Inc.,* 944 F.2d 658, 667 (9th Cir.1991) (holding when a participant "fails to make a specific request for the information at issue, he has no litigable claim under [§ 1131(c)(1)(B) ].""). In *Dall,* the District of Maine found that the plaintiff's request for a document titled "Retirement Plan Amendment Report" was sufficient to put the plan administrator on notice that the plaintiff was interested in receiving information regarding amendments made to the plan even though no document with that title actually existed. *Dall,* 33 F.Supp.2d at 34–35. The court also found that the plaintiff's request to examine the "Retirement Plan Amendment Report" also provided sufficient notice that plaintiff wanted information regarding amendments to the plan. *Id.* at 36. However, the plaintiff's general requests for information made prior to the latest amendments did not give the plan administrator notice that the plaintiff wanted information pertaining to these amendments. *Id.* at 37.

Though the cases holding that a request for documents must be specific to the provision at issue to trigger 29 U.S.C. § 1132(c)(1)(B) are not Third Circuit cases, the scarcity of applicable case law in the Third Circuit requires this Court to look to other Circuits and District Courts for guidance on the issues raised in the instant case. None of the information Plaintiff requested from Defendant Day referred in any way to modifications in the Plan. Plaintiff contends that Defendant should have known that he had to supply a summary description of pending modifications because he knew Transcapital was considering modifying the Plan at the time Plaintiff made his requests. However, even if that were true, Plaintiff's *request* for information not related to modifications of the Plan would not in itself trigger 29 U.S.C. § 1132(c)(1)(B) such that Day would have been required to supply summary descriptions of modifications within 30 days or be subject to civil penalties.

■ However, where, as here, a plan administrator fails to provide a plan participant with information ERISA requires the plan administrator to automatically furnish and there are no specific penalty provisions for such failure, pursuant to 29 U.S.C. § 1132(a)(3), a court may impose any appropriate equitable relief, including penalties under 29 U.S.C. § 1132(c)(1)(B). *See, e.g., Simeon v. Mount Sinai Medical Center*, 150 F.Supp.2d 598, 603–04 (S.D.N.Y.2001). The exercise of such discretion by this Court does not ignore the plain language of 29 U.S.C. § 1132(c)(1)(B), but rather adopts its penalty provision to remedy an ERISA violation for which no other specific recourse is provided. The Court finds that Defendant was required to automatically provide Plaintiff with information regarding the modification of the Plan pursuant to 29 U.S.C. § 1024(b)(1) without any request. Plaintiff was never notified that his policy was cashed in and that the Plan was terminated. The Third Circuit, in *Ackerman v. Warnaco, Inc.*, 55 F.3d 117 (3d Cir.1995), has made clear that there is no fundamental difference between a plan amendment and a termination. Thus, the Court held that the provision in 29 U.S.C. § 1024(b)(1) requiring plan administrators to provide participants with "a summary description of modification or change ... not later than 210 days after the end of the plan year in which the change is adopted" applies to termination of a plan as well. *Ackerman*, 55 F.3d at 124. The Court took no position on whether the 210 day notice period sufficiently protects an employee's rights in the case of termination as opposed to modification. The Third Circuit acknowledged, however, that at least one court has determined that 210 days after the end of the plan year in which the change has been adopted is too long a period for an employee to wait to be notified that a plan has been terminated and, instead, that "prompt" notice is required. *Id.* (citing *Rucker v. Pacific FM, Inc.*, 806 F.Supp. 1453, 1459 (N.D.Cal.1992)). Indeed, the *Rucker* court held that prompt notice is necessary to promote ERISA's goal to safeguard "the well-being and security of working men and women and apprise them of their rights and obligations under any employee benefit plan." *Rucker*, 806 F.Supp. at 1459 (citing *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1356 (9th Cir.1984)), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985)(quoting *Donovan*, 688 F.2d at 1372)). The reporting and disclosure requirements of ERISA are designed to ensure that the individual participant knows exactly where he stands with respect to the plan and to enable employees to police their plans. *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1170 (3d Cir.1990).

■ It is, therefore, apparent that ERISA required Day to promptly notify Plaintiff that the Plan was terminated and, because he did not, he violated that statute. Borrowing from statutes and concepts discussed above, the Court determines that a reasonably prompt period of time for a fiduciary's self-initiated notification of a plan's termination would be 30 days. Here, it would appear that the surrender and cashing-in of the CIGNA policy was completed on approximately July 1, 1994. Accordingly, this Court holds that Day was duty-bound to notify plaintiff of this event by August 1, 1994. It is from this latter date, therefore, that the assessment of the statutory penalties described in 29 U.S.C. § 1132(c)(1)(B) will begin.[3] The Court now proceeds to quantify this recovery.

---

**3.** In *Ackerman v. Warnaco, Inc.*, the Third Circuit acknowledged that the § 1132(c)(1)(B) monetary remedies applied to § 1024(b)(1) violations. 55 F.3d at 124.

■ One question to be addressed is whether the assessment for this failure to provide the required information should continue after the date of death of Mr. Day, the person liable. Assuming that this assessment is enforceable against his estate, should the time period during which that assessment is calculated conclude in February 1997 when Mr. Day died? If not, is there any other date which ends the assessment period? Finally, what daily amount should the Court select? These questions are addressed below.

■ Whether a court makes a monetary award under 29 U.S.C. § 1132(c)(1)(B) is a matter of discretion. *Hennessy v. Federal Deposit Ins. Corp.*, 58 F.3d 908, 924 (3d Cir.1995). In deciding whether to assess a penalty under 29 U.S.C. § 1132(c)(1)(B), other courts have considered such factors as "bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made, the documents withheld, and the existence of any prejudice to the participant or beneficiary." *Jones v. Aetna Life Ins. Co.*, No. CIV. A.01–2476, 2002 WL 1870469, at *9 (E.D.Pa. Aug.14, 2002) (citing *Fox v. Law Offices of Shapiro & Kreisman*, No. CIV. A.97–7393, 1998 WL 175865, at *13 (E.D.Pa. Apr.13, 1998) (quoting *Pagovich v. Moskowitz*, 865 F.Supp. 130, 137 (S.D.N.Y.1994))). Courts have also generally held that the statutory penalty provision is in the nature of punitive damages designed more to punish the intransigent administrator and to teach ERISA fiduciaries a needed lesson than to compensate the plan participant for actual loss. Thus, bad faith in failing to provide required information, while not dispositive, is, for many courts, an important consideration in deciding whether to impose penalties. *See, e.g., Kascewicz v. Citibank, N.A.*, 837 F.Supp. 1312, 1322 (S.D.N.Y.1993); *Porcel-*

*lini v. Strassheim Printing Co.*, 578 F.Supp. 605, 614 (E.D.Pa.1983); *Sandlin v. Iron Workers Dist. Council Pension Plan*, 716 F.Supp. 571, 574 (N.D.Ala.1988), *aff'd without opinion*, 884 F.2d 585 (11th Cir.1989).

Not surprisingly, the facts and circumstances of a particular case play a significant role in the court's selection of the amount of the daily penalty. Some decisions reflect token sanctions (*see Patterson v. Retirement and Pension Plan for Officers and Employees of the New York District Council of Carpenters & Related Organizations*, Civ. A. 00–5962, 2001 WL 1178670, at *7–8 (S.D.N.Y. Oct. 5, 2001) ($.10 per day)). Others involved assessments of $10.00 per day, *Austin v. Ford*, Civ. A. 95–3730, 1998 WL 88744, at *6–7 (S.D.N.Y. Mar. 2, 1998); $15.00 per day *McDonald v. Pension Plan of the NYSA–ILA Pension Trust Fund*, Civ. A. 99–9054, 2001 WL 1154630, at *6–7 (S.D.N.Y. Oct. 1, 2001); and $25.00 per day, *Kascewicz v. Citibank, N.A.*, 837 F.Supp. 1312 (S.D.N.Y. 1993), all for reasons well explained in those opinions.

In *Daniels v. Thomas and Betts Corp.*, 263 F.3d 66 (3d Cir.2001), the Third Circuit upheld this Court's imposition of a $100.00 per day penalty under 29 U.S.C. § 1132(c)(1)(B) where the undersigned found that the defendant failed to respond in any way over a very extended period of time and offered no explanation for refusing to provide the information requested. There was no indication that the refusal was some sort of administrative mistake, and this Court did not accept that the defendant acted on some legal basis for refusing to provide the documents while not informing the plaintiff's attorney of such a position at the time the latter requested the documents on behalf of the plaintiff. On appeal, the defendant argued that the maximum penalty should not be

enforced because the defendant did not act in bad faith. However, though noting that it found that the defendant's "conduct fell something short of good faith effort at compliance," the Third Circuit found that it was not necessary to characterize the conduct but rather only to find, as it did, "that the reasons identified by the District Court were sufficient to bring its ultimate conclusion well within the scope of its considerable discretion." *Id.* at 79–80.

 In the case at bar, ERISA required Day, as the Plan Administrator, to automatically provide Plaintiff Colarusso with a description of any modifications made to the Plan, including termination. Plaintiff need not have made any requests for such information. From Plaintiff's testimony at trial, it appears that Day acted in bad faith by informing Plaintiff that he would have to wait until the ten year expiration date of the Plan to claim any benefits and then terminating the Plan immediately after that conversation. (January 8, 2002 Transcript, 46:9–12, 52:16–19). Furthermore, in the honest belief that the Plan remained in *status quo,* Plaintiff in fact did wait until 1997 to seek his benefits under the Plan. He was clearly misled as to the Plan's existence. Had Day provided Plaintiff with a description of the termination as required by ERISA, Plaintiff would have had the opportunity to assert his rights at that point rather than waiting for over three years under the impression that he would be receiving benefits that in reality no longer existed. Thus, unlike in *Patterson,* 2001 WL 1178670, *McDonald,* 2001 WL 1154630, and *Austin,* 1998 WL 88744, the Court finds evidence of both bad faith and prejudice here. Furthermore, as in *Kascewicz,* 837 F.Supp. 1312, Plaintiff had to retain counsel to discover that the Plan had been terminated. However, unlike in *Daniels,* as well as the other cases cited above, because Plaintiff did not make any requests for the particular information at issue, Day's failure to comply with ERISA regulations does not warrant the maximum penalty. While Day was required by ERISA to automatically provide such information, his failure to comply with such a provision is not the same as a blatant refusal to respond to a request by an attorney on behalf of a beneficiary, as in *Daniels,* or by a participant himself. The Court determines that $50.00 is an appropriate *per diem* penalty here.

As for the penalty period, borrowing from 29 U.S.C. § 1132(c)(1)(B), the Court has found 30 days to be the appropriate amount of time in which an administrator must inform plan participants that a plan has been terminated, as opposed to the 210 days allowed to inform participants about modifications. Therefore, the Court finds the penalty period commences on August 1, 1994, because, as stated above, the Plan was terminated on approximately July 1, 1994. Because the purpose of the penalty provisions of ERISA is primarily punitive rather than compensatory, the Court finds that it would be inappropriate to impose such penalties on the Estate of Day for any period of time running after the date of Day's death. While there does not appear to be a uniform rule as to the final date of a penalty period, most courts end the penalty period at the time the requisite information is supplied, whether prior to or after the commencement of litigation. However, because Day was killed prior to the date that Plaintiff received information regarding the termination of the Plan, the Court determines, in keeping with the purpose of the penalty provision, that the appropriate ending date of the penalty period here is that date of Day's death. Accordingly, the penalty period will end on

February 14, 1997.[4] Nine hundred and twenty-eight days at $50.00 per day generates a statutory penalty of $46,400.00, which the Court imposes upon the Estate of Eugene T. Day, Jr., plus post-judgment interest.

### CONCLUSION

For the reasons set forth above, the Court finds Defendant Estate of Eugene T. Day, Jr. liable to Plaintiff William Colarusso on Count II of the Complaint in the sum of $46,400.00, plus post-judgment interest. Because Defendant prevailed on Counts I and III and Plaintiff prevailed on Count II, each party shall bear its own costs in this matter.

### JUDGMENT

For the reasons stated by the Court in its oral opinion delivered from the bench on January 11, 2002, and in its written opinion dated August 27, 2002

IT IS on this 27th day of August 2002 ORDERED that:

1. Plaintiff's claims in Counts I and III of his Complaint be, and the same hereby are, dismissed in their entirety, with prejudice; and

2. Judgment is hereby entered in favor of the Plaintiff and against the Defendant Estate of Eugene T. Day, Jr. in the amount of $46,400.00 plus post-judgment interest; and

3. Each party shall bear its own costs.

---

4. In the Final Pre–Trial Order, the parties stipulated that Day was killed in an automobile accident in February 1997. Neither party informed the Court as to a more specific date of death. The Court has selected the mid-point of that month.